IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL ACTION |
| v. : | |
| : | 13-270 |
| CHRISTOPHER MAILLOUX : | |

MEMORANDUM

**Stengel, J.**                                                                                                 **July 22, 2015**

In a four count indictment, the United States charges Christopher Mailloux with production and possession of child pornography. Mr. Mailloux claims that Berks County detectives seized evidence and took statements in violation of the Fourth and Fifth Amendments. He moves to suppress this evidence. Berks County Detectives Trevor Ritter, Christopher Stouch and Thomas Weaver testified to the circumstances of the contested search and seizure at hearings held on April 23 and May 14, 2015. Based on the evidence from the hearing and the arguments of counsel, I will grant Mr. Mailloux's motion in part.

**I.    Background**

On December 12, 2012, Berks County Detectives executed a search warrant at 348 Pearl Street in Reading. The search warrant was based on probable cause that Danny Evans, Jr., a resident at the address, was harassing juvenile girls online.[1] The search

---

[1] There is no dispute that detectives had probable cause to search 348 Pearl Street. The manager of an online gaming website complained to Berks County Detectives that an individual, going by the name Danny Femis Appollo, had been utilizing congregate.com to harass minor females and demanding sexually explicit photos and videos of the

warrant authorized detectives to seize all computer hardware at the address. The computers were to be "searched for evidence relating to the electronic harassment by communications incidents." Five people were present at 348 Pearl Street when the detectives arrived: Danny Evans, Colleen Morton (Evans' mother), Christina Evans (Evans' sister), Robert Mailloux (Christina's boyfriend) and defendant Christopher Mailloux (Robert's brother). In total, seven detectives, including Detectives Ritter, Stouch and Weaver, executed the search warrant.

      Detectives arrived at 7:40 a.m. Christina Evans let the detectives into the home. The detectives gathered Danny Evans, Christina Evans, Robert Mailloux and Christopher Mailloux in the living room.[2] At the April 23 hearing, the detectives' attempts to recount the details of what occurred in the living room were challenged by defense counsel. Detectives Ritter and Stouch testified that Detective Ritter read the occupants the warrant and that Detective Stouch informed the occupants that they were not under arrest and that they were free to leave. Despite robust cross examination from defense counsel, both detectives affirmed multiple times that no one in the house was handcuffed.

      Following the April 23 hearing, counsel for the government wrote a letter to the court alerting the court and defense counsel that the detectives recalled, at some point after the hearing, that, in fact, the occupants of the house, with the exception of Colleen Morton, were handcuffed in the living room before the search. We reconvened on May

---

girls. Detectives learned the IP address of the Danny Femis Appollo, and Comcast Cable, the internet service provider, informed detectives that the IP address was assigned to Colleen Morton at 348 Pearl Street in Reading. Colleen Morton is Danny Evans' mother. Detectives also located a facebook page for Danny Femis Appollo which included photographs of Danny Evans, Jr. and identified Danny Evans, Sr. as Danny Femis Appollo's father. The United States has charged Mr. Evans with production of child pornography in docket number 13-cr-333.

[2] Colleen Morton, who is disabled, remained in her bedroom.

14 solely to explore the issue of who was handcuffed, when and for how long. Both Detectives Ritter and Stouch recanted their earlier testimony. They explained that when they returned to their offices they reviewed the case file and found photos of the occupants in the living room in handcuffs. Detective Stouch was the photographer. Additionally, the detectives were no longer certain that the occupants were informed of their right to leave the premises during the search. At the conclusion of the second hearing, Detective Weaver testified that the decision to handcuff the occupants was made by "a supervisor" at approximately 7:50 a.m. He explained that the residents were informed of their right to vacate the property prior to being handcuffed, and that Detective Ritter was not in the living room when the occupants were restrained. No one knows when the handcuffs were removed.

At approximately 8:00 a.m., Detective Stouch read <u>Miranda</u> warnings to Danny Evans and questioned Mr. Evans in the kitchen. Mr. Evans admitted that he harassed young girls online and that he captured screen shots of the girls engaged in sexual activity. Mr. Evans wanted to make clear, however, that he only went after teenage girls unlike Christopher Mailloux who downloaded pornographic images of toddlers. Mr. Evans made a written statement which he signed at 9:12 a.m. Government's Ex. 5.

Following Mr. Evan's accusation, Detectives Stouch and Ritter invited Mr. Mailloux to speak with them on the second floor.[3] Detecitve Stouch testified as follows:

---

[3] This was another area where Detective Ritter contradicted himself. At the April 23 hearing, Detective Ritter testified he was aware of Mr. Evans' accusation. On May 14, Detective Ritter denied he knew about the accusation when he took Mr. Mailloux to the second floor.

3

> I began with asking Mr. Mailloux if he had seen Danny doing any of the – any of these things like talking to people or taking these screen shots and sending them or witnessed any of Danny's activities. He said yes
>
> I asked him if there's any child pornography on the computers, and he said, "I'm a pedophile." And I was taken aback by that. I then asked him well, what do you mean? And he said well, I'm a pedophile. And I said well, what age are you interested in? And he said three to nine-year-olds and both boys and girls.
>
> And I asked him have you ever acted on that and touched a child? And he said no, that is a line I would never cross. I said – I then asked him do you have any child pornography on any of these computers? And he said no, I have animated child pornography, like cartoon pictures of children being abused, but he said that, to his knowledge, that's not illegal to have that, and that's what he was into.
>
> I asked him okay, when I forensically analyze these computers where would I find this child pornography, and he specified the directory on the computer where I would find it. It was in like a hidden folder to say, off the – off of the hard drive. And that was it.

Transcript of Oral Argument at 75:4 – 76:3 (Apr. 23, 2015).[4] Mr. Mailloux memorialized his statement in writing which he completed at 9:05 a.m. Government's Ex. 2. Neither Detective Stouch nor Detective Ritter provided Mr. Mailloux with <u>Miranda</u> warnings prior to questioning.

The detectives seized all the computers at the residence,[5] but did not arrest anyone on December 12. Based on Mr. Mailloux's statement, Detective Ritter secured a second warrant to search the computers and located over 1000 pornographic images of children, some as young as infants. Armed with this evidence, detectives obtained an arrest warrant for Mr. Mailloux. Berks County Sergeant McQuate arrested Mr. Mailloux at 348 Pearl

---

[4] Detective Ritter testified that Mr. Mailloux made these admissions unprovoked and without questioning. Transcript of Oral Argument at 18:1 - 13 (Apr. 23, 2015). This assertion is different from Detective Stouch's testimony. I will be guided by Detective Stouch's version of events.

[5] It is not clear whether the computers were seized before or after detectives spoke with Mr. Mailloux; however, the timing of the seizure is not material to the disposition of the motion.

4

Street on December 19, 2012. The parties stipulated that if Sergeant McQuate was called to testify, he would state:

> His involvement was walking Mr. Mailloux from the house to the police vehicle, and Mr. Mailloux was not Mirandized, that he handcuffed Mr. Mailloux when walking him toward the car, when Mr. Mailloux said to Mr. Mcquate I guess my military career is over, or words to that effect, Sergeant McQuate responded, "Why is that?" and Mr. Mailloux said in return "I guess because of the real stuff they got off of my computer," or words to that effect.

Transcript of Oral Argument at 101:6-101:17 (Apr. 23, 2015).

Mr. Mailloux was taken to an interview room at the Berks County Detectives' Office with Detective Ritter and Detective Harold Shenk. Detective Shenk advised Mr. Mailloux of his Miranda rights. Mr. Mailloux signed a Miranda waiver. Government's Ex. 4. Mr. Mailloux confessed to the production and possession of child pornography which he formalized in writing. Id.

## II.   Legal Standard

"As a general rule, the burden of proof is on the defendant who seeks to suppress evidence." United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995) (citing United States v. Acosta, 965 F.2d 1248, 1256 n. 9 (3d Cir.1992). If the defendant establishes that a seizure occurred without a warrant or that a confession was obtained without Miranda warnings, the burden shifts to the government. Id. (citing United States v. McKneely, 6 F.3d 1447, 1453 (10th Cir. 1993). In a Fourth Amendment case, the government must prove by a preponderance of the evidence that the search and seizure were reasonable under the circumstances. See Lego v. Twomey, 404 U.S. 477, 489 (1972). In a Fifth Amendment case, the government must prove by a preponderance of the evidence that

5

the confession was not the product of a custodial interrogation. *See* Colorado v. Connelly, 479 U.S. 157, 168 (1986).

### III. Discussion

#### a) Fourth Amendment

Mr. Mailloux moves to suppress the evidence in this case because he was arrested without probable cause. The Fourth Amendment provides, "the right of the people to be secure in their persons … against unreasonable searches and seizures, shall not be violated…." U.S. Const. amend. IV. "The central inquiry under the Fourth Amendment [is] the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." Terry v. Ohio, 392 U.S. 1, 19 (1968). A warrantless arrest is reasonable if the arrest is supported by probable cause. Maryland v. Pringle, 540 U.S. 366, 370 (2003). Probable cause to arrest exists when "the facts and circumstances within [the officer's] knowledge and of which [the officer] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964).

Seizures which fall short of a formal arrest must also comply with the Fourth Amendment. United States v. Mendenhall, 446 U.S. 544, 551 (1980). "[A] seizure occurs only 'when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" United States v. Brown, 765 F.3d 278, 288 (3d Cir. 2014) (quoting United States v. Crandell, 554 F.3d 79, 84 (3d Cir.2009)). However, some seizures "constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they

6

may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity." Michigan v. Summers, 452 U.S. 692, 699 (1981). The detention of an occupant of a home during the execution of a search warrant is one such limited intrusion and is reasonable under the Fourth Amendment. Id. at 705. Accordingly, Mr. Mailloux's detention during the execution of the search warrant at 348 Pearl Street did not violate the Fourth Amendment.

During argument, defense counsel conceded that a detention incident to search is reasonable. However, he contends that Mr. Mailloux's detention was transformed into an unlawful arrest when detectives moved Mr. Mailloux to the second floor for questioning. While questioning Mr. Mailloux during a detention incident to a search may raise Fifth Amendment issues, *see* United States v. Hargrove, 625 F.3d 170, 179 (4th Cir.2010); United States v. Revels, 510 F.3d 1269, 1272–77 (10th Cir.2007); United States v. Mittel–Carey, 493 F.3d 36, 37–40 (1st Cir.2007); United States v. Newton, 369 F.3d 659, 673-77 (2d Cir.2004), it was plainly permissible under the Fourth Amendment. Muehler v. Mena, 544 U.S. 93, 100-101 (2005). In this context, Mr. Mailloux must establish that the detectives' questioning created a discrete Fourth Amendment event. *See* Id.

There is no discrete Fourth Amendment event because the detectives' questioning of Mr. Evans exceeded the questioning of Mr. Mailloux. *See* Illinois v. Caballes, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."); *see also* Terry, 392 U.S. at 18 (internal citations omitted) ("[A] search which is reasonable at its inception may violate the Fourth

7

Amendment by virtue of its intolerable intensity and scope."). The search of 348 Pearl Street reasonably could have extended at least until the detectives finished questioning Mr. Evans who was the target of the search. That questioning concluded at 9:12 a.m. when Mr. Evans completed his written confession. Detective Stouch finished questioning Mr. Mailloux by 9:05 a.m. which is the time noted on Mr. Mailloux's written statement. Accordingly, there is no evidence that questioning Mr. Mailloux unreasonably prolonged the search of 348 Pearl Street. Detectives questioning of Mr. Mailloux did not violate the Fourth Amendment. Mena, 544 U.S. at 100-101.

Even if taking Mr. Mailloux to the second floor for questioning could establish a discrete Fourth Amendment event, the detectives had adequate suspicion to question him. "Police encounters with citizens fall into one of three broad categories, each with varying degrees of constitutional scrutiny: '(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests.'" Brown, 765 F.3d at 288 (quoting United States v. Perez, 443 F.3d 772, 777 (11th Cir.2006)). Mr. Mailloux was clearly detained so the questioning does not fall into the first category. The questioning was also not a formal arrest which is traditionally defined as taking a suspect into custody for the prosecution of a crime. *See* Terry, 392 U.S. at 16. Rather, this was a brief detention to investigate possible criminal behavior even though there was no probable cause to arrest. Id. at 22. Detectives needed reasonable suspicion to question Mr. Mailloux. Brown, 765 F.3d at 288 (citing Illinois v. Wardlow, 528 U.S. 119, 123 (2000)).

Mr. Evans' accusation that Mr. Mailloux downloaded child pornography provided detectives with reasonable suspicion to question Mr. Mailloux. *See* Adams v. Williams, 407 U.S. 143, 147 (1972) (tip from known informant can provided reasonable suspicion). Reasonable suspicion must be "supported by articulable facts that criminal activity 'may be afoot.'" U. S. v. Sokolow, 490 U.S. 1, 7 (1989) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). Articulable facts are more than, "inchoate and unparticularized suspicion or hunch." Sokolow, 490 U.S. at 7. Reasonable suspicion requires "some minimal level of objective justification." Id. (citing INS v. Delgado, 466 U.S. 210, 217 (1984)). Mr. Evans described with particularity the types of images Mr. Mailloux downloaded. The detectives' already had probable cause to believe that crimes against children were being committed from this residence. With information from Mr. Evans that his roommate engaged in similar criminal behavior, it was reasonable for the detectives to question Mr. Mailloux to dispel or confirm the accusation. Indeed, it would have been irresponsible for the detectives to ignore Mr. Evans' assertion and go on their way. Questioning Mr. Mailloux was reasonable and justified under the circumstances.

Even without the brief detention and questioning, the detectives inevitably would have discovered the child pornography which Mr. Mailloux downloaded and created on his computer. "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means … then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." Nix v. Williams, 467 U.S. 431, 444 (1984). In this case, the detectives had a search warrant to seize all computer hardware at the address. That

included Mr. Mailloux's computers. Had Mr. Mailloux not cooperated, the detectives would have seized the subject computers anyway. The resulting forensic analysis of the hard drives would have revealed the incriminating images. If I were to find a constitutional error in the detention and questioning process, it would appear to be harmless error. The detectives had every right to seize all computers in the house, regardless of whether they could remember who they handcuffed and when, or regardless of whether they asked questions of the defendant in custody or otherwise. There is no basis to exclude the images found on Mr. Mailloux's computers or any derivative evidence.

### b) Fifth Amendment

Persons subject to custodial interrogation are entitled to be informed of their right to remain silent, their right to an attorney, and their right to have a lawyer appointed for them. Miranda v. Arizona, 384 U.S. 436, 444–45. A person is in custody if, given the totality of the circumstances surrounding the interrogation, a reasonable person would not feel at liberty to terminate the interrogation and leave. J.D.B. v. North Carolina, 131 S. Ct. 2394, 2402 (2011). This is an objective analysis; the subjective views of the defendant and detectives are irrelevant. Id. "'[I]nterrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

Whether Mr. Mailloux was in custody for Fifth Amendment purposes must be analyzed separately from the Fourth Amendment seizure. *See* United States v. Revels, 510 F.3d 1269, 1274 (10th Cir. 2007) (citing Berkemer v. McCarty, 468 U.S. 420, 440 (1984)) ("Although some detentions not rising to the level of a formal arrest may be reasonable within the meaning of the Fourth Amendment, those same detentions may nonetheless create the custodial situation in which Miranda was designed to operate."). "[The court ] considers five factors to determine whether [Mr. Mailloux] was objectively free to leave:"

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

United States v. King, 604 F.3d 125, 138 (3d. Cir. 2010) (citing United States v. Willaman, 437 F.3d 354, 359 (3d Cir.2006)). "The ultimate inquiry is simply whether there is a … restraint on freedom of movement of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal citations and quotation marks omitted). Unwarned incriminating statements may not be used by the prosecution at trial; however, the prosecution may use derivative evidence discovered as a result of the unwarned statement. United States v. DeSumma, 272 F.3d 176, 179-180 (3d Cir. 2001)

First, I have doubts about whether the detectives advised the occupants they were free to leave. At the first hearing, Detective Stouch claimed that he personally told the occupants they could go. At the second hearing, he had no memory of informing the

11

occupants of that right. Detective Ritter never heard anyone instruct the occupants that they were free to leave, but he assumed the occupants were notified pursuant to department policy. Detective Weaver's testimony was unpersuasive. In any event, handcuffing Mr. Mailloux at around the same time he was told that he could leave the premises would send a mixed message, at best. If I am to apply an objective standard to this scenario, it would seem a statement like "you are free to leave" would have a hollow ring to someone who is in handcuffs, was in handcuffs or is about to be placed in handcuffs. I could understand how someone in that circumstance would believe he was not, in fact, free to go. *See* United States v. Newton, 369 F.3d 659, 676 (2d Cir. 2004) ("[T]elling a suspect that he is not under arrest does not carry the same weight in determining custody when he is in handcuffs as it does when he is unrestrained."). The first King factor favors a finding of custody.

Second, the questioning occurred in Mr. Mailloux's home. Questioning a suspect in his home is to be contrasted with an interrogation at the police station and is typically not indicative of custody. In this case, seven armed detectives entered 348 Pearl Street in the early morning hours to conduct the search. Mr. Mailloux's home was unquestionably under the detectives' control. Whatever security Mr. Mailloux may typically have enjoyed while in his home was certainly absent during the search of the premises. *See* United States v. Fautz, 812 F. Supp. 2d 570, 619 (D.N.J. 2011) ("Second, the location was his own home, but at that time the entire premises was visibly subject to the unquestioned command of the officers."). The second King factor also favors Mr. Mailloux's position.

While not clearly established in court, it appears that Detective Stouch questioned Mr. Mailloux for less than one hour.[6] Although relatively short, the length of the questioning, considered within the totality of the circumstances of this case, supports a finding of custody. *See* J.D.B. v. North Carolina, 131 S. Ct. at 2402 (whether a person is in custody must be judged from the totality of the circumstances). This is not a situation where law enforcement subjected a suspect to hours of questioning before finally overcoming the will of the defendant. After one question, Mr. Mailloux immediately responded that he was a pedophile. While asking a defendant one question is not sufficiently long to support a finding of custody, the questioning exceeded an appropriate length once Detective Stouch continued to interrogate Mr. Mailloux after his immediate incriminating admission. The third King factor suggests that Mr. Mailloux was in custody.

As Mr. Mailloux was in handcuffs, the fourth King factor is easily met. Testimony established that Mr. Mailloux was handcuffed for a significant, yet undetermined, period of time. It was the government's burden to prove that Mr. Mailloux was unrestrained during questioning, and it failed to meet this burden. If he was unrestrained during questioning, it is possible, even likely, that his roommates remained handcuffed in the living room. No witness could recall, and the government could not establish when, or if, the handcuffs were removed from the occupants gathered in the living room. How would this have impressed Mr. Mailloux? If he refused to speak to detectives, would he be

---

[6] Mr. Evans implicated Mr. Mailloux shortly after 8:00 a.m., and Mr. Mailloux signed his written statement at 9:05 a.m. Furthermore, Detective Stouch testified to asking only six questions.

placed back in handcuffs and returned to the living room? The use of handcuffs during the search supports a finding of custody and is nearly dispositive of the entire custodial inquiry. *See* United States v. Newton, 369 F.3d 659, 677 (2d Cir. 2004) (internal citations omitted) ("[W]e must conclude that handcuffing Newton, though reasonable to the officers' investigatory purpose under the Fourth Amendment, nevertheless placed him in custody for purposes of Miranda.").

    The final King factor supports the government's position. Mr. Mailloux's responses were clearly voluntary. There is no evidence that Mr. Mailloux resisted Detective Stouch's questions or gave any indication that he did not want to answer. To the contrary, he seemed all too willing to cooperate. This finding, however, pales in comparison to the overwhelming evidence of custody in this case. Mr. Mailloux was obviously in custody during the search of 348 Pearl Street on December 12, 2012.

    Detectives were required to advise Mr. Mailloux of his Miranda rights before asking him questions "reasonably likely to elicit an incriminating response…." Innis, 446 U.S. at 301. Detective Stouch first asked "if [there was] any child pornography on the computers." A response in the affirmative, which in fact occurred, would clearly be incriminating. He then asked Mr. Mailloux where on the computers he stored the illicit images. Detective Stouch's questions were clearly aimed at learning incriminating information. His failure to warn Mr. Milloux before-hand is a blatant Miranda violation,

and I will suppress all verbal and written statements made by Mr. Mailloux during the search of 348 Pearl Street on December 12, 2012.[7] DeSumma, 272 F.3d at 179.

     Finally, I am concerned by the testimony offered by Detectives Ritter and Stouch during the first hearing. While counsel for the government immediately advised the court of the errors in the April 23 testimony and the detectives offered an innocent explanation for their incorrect testimony, the fact that their now recanted testimony weighed upon critical elements of the custody analysis gives me pause. Indeed, if it were not for the diligence of defense counsel, I would be ruling on this motion based on a record that Mr. Mailloux was not handcuffed and that he was informed of his right to leave the premises. The disposition of this motion very likely would have been different. The subsequent disclosure of and explanation for the mistaken testimony from the two detectives, each material witnesses in the government's case corrected the record. While I do not believe the detectives' testimony was deliberately false, their certainty at the April 23 hearing that no occupants of the house were handcuffed, followed by the epiphany on their return to the office is troubling. In the interest of full disclosure and candor with the court, they came forward and corrected their mistake. That is to be commended. So too will be their resolve to get the facts straight before testifying with such certainty in the future.

---

[7] Since the failure to administer Miranda warnings creates a presumption of compulsion, I will not reach Mr. Mailloux's alternative argument that his December 12 confession was involuntary. See DeSumma, 272 F.3d at 179 (citing Oregon v. Elstad, 4770 U.S. 298, 306-307 (1985)).

## IV.     Conclusion

I will exclude Mr. Mailloux's incriminating statements made without the benefit of Miranda warnings from evidence at trial. DeSumma, 272 F.3d at 179. This order, however, only extends to the verbal and written statements made by Mr. Mailloux during the search of 348 Pearl Street on December 12, 2012. The Miranda violation does not warrant the suppression of the images found on Mr. Mailloux's computer or the statements Mr. Mailloux made during and after his arrest on December 19. Id. at 180-81 ("Thus, even though the defendant's seized gun was secured as a result of his non-Mirandized statement, it was properly admitted."). As there is no Fourth Amendment violation or any other reason to suppress the images or the December 19 statements,[8] they are admissible at trial.

An appropriate order follows.

---

[8] Mr. Mailloux's statement to Sergeant McQuate is best described as a spontaneous utterance and is not the result of a custodial interrogation. See United States v. Nelson, 483 F. App'x 677, 683 (3d Cir. 2012); United States v. Coates, 457 F. Supp. 2d 563, 570 (W.D. Pa. 2006). Mr. Mailloux's statements at the detectives' office were fully warned and voluntary. While not argued by defendant, I agree with the government that the interrogation at the detectives' office does not bear the hallmarks of an unlawful two-step interrogation, because Sergeant McQuate never interrogated Mr. Mailloux. See Missouri v. Seibert, 542 U.S. 600 (2004).